# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
### GAINESVILLE DIVISION

**THADDEUS J. GREZIK,**

     **Plaintiff,**

**vs.**                                 **Case No.  1:08cv1-MP/WCS**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

     **Defendant.**

_____/

## REPORT AND RECOMMENDATION[1]

     This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. LOC. R. 72.2(D).  It is recommended that the decision of the Commissioner be affirmed.

---

[1] Descriptions of the purpose and effects of prescribed drugs are from PHYSICIANS' DESK REFERENCE, as available to the court on Westlaw, or PDRhealth™, PHYSICIANS DESKTOP REFERENCE, found at http://www.pdrhealth.com/drugs/drugs-index.aspx. Information about medical terms and prescription drugs come from DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, available at:  http://www.mercksource.com (Medical Dictionary link).

**Procedural status of the case**

Plaintiff, Thaddeus J. Grezik, applied for disability insurance benefits and supplemental security income benefits.  Plaintiff was nearly 44 years old at the time of the second administrative hearing, has a 12th grade equivalency education, and has past relevant work as a retail store manager and a kitchen and restaurant manager. Plaintiff alleges disability due to degenerative disc disease of the cervical spine and adjustment disorder.

The first administrative hearing resulted in an unfavorable decision dated September 26, 2003 .  R. 47-56.  The Appeals Counsel remanded to give further consideration to Plaintiff's residual functional capacity, to assess the severity of Plaintiff's mental impairment, and to obtain evidence from a vocational expert.  R. 69-70.


The second hearing resulted in another unfavorable decision.  R. 17-27.  The Administrative Law Judge found that Plaintiff has the residual functional capacity to do light work, with limitations, and can still do his past relevant work as a manager of a retail store and food services.  R. 27.  Therefore, the ALJ concluded that Plaintiff is not disabled as defined by Social Security law.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler,

703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d

1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if

supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir.

2002).  "If the Commissioner's decision is supported by substantial evidence we must

affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232,

1240, n. 8 (11th Cir. 2004) (citations omitted).  The court must give "substantial

deference to the Commissioner's decision."  Dyer v. Barnhart, 395 F.3d 1206, 1211

(11th Cir. 2005).  "A 'substantial evidence' standard, however, does not permit a court to

uphold the Secretary's decision by referring only to those parts of the record which

support the ALJ.  A reviewing court must view the entire record and take account of

evidence in the record which detracts from the evidence relied on by the ALJ."  Tieniber

v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed

all evidence and has sufficiently explained the weight he has given to obviously

probative exhibits, to say that his decision is supported by substantial evidence

approaches an abdication of the court's 'duty to scrutinize the record as a whole to

determine whether the conclusions reached are rational.' "  Cowart v. Schweiker, 662

F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the

claimant is not only unable to do past relevant work, "but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work

which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).  A disability is an

"inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12

months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must

be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122

S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

      The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

1.     Is the individual currently engaged in substantial gainful activity?

2.     Does the individual have any severe impairments?

3.     Does the individual have any severe impairments that meet or
     equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.     Does the individual have any impairments which prevent past
     relevant work?

5.     Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of

the application for benefits.  A positive finding at step three results in approval of the

application for benefits.  At step four, the claimant bears the burden of establishing a

severe impairment that precludes the performance of past relevant work.  If the claimant

carries this burden, the burden shifts to the Commissioner at step five to establish that

despite the claimant's impairments, the claimant is able to perform other work in the

national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050,

1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove

that he or she cannot perform the work suggested by the Commissioner.  Hale v.

Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Evidence from the Administrative Hearing**

The first administrative hearing took place on April 16, 2003.  R. 651.  Plaintiff said he drove himself to the hearing and that he drove a motor vehicle about 80 miles a week.  R. 655.  He was 41 years of age at the time of that hearing.  R. 656.

Plaintiff testified at the first hearing that he experienced a lot of pain in his neck, lower skull, and shoulder blades.  R. 663.  He said that repetitive movements of his arm and shoulder irritated him, and that he lacked focus and endurance.  *Id.*  He described motion of his head felt like "bone on bone grinding," and asserted that he had a "strong, irritating pain" and muscle spasms.  *Id.*  He also said he had anxiety when he slept or when his neck was bothering him, and it became hard to breathe.  *Id.*  He said his physician had prescribed steroid injections in his neck and physical therapy.  R. 663-664.  His physician told him to use his neck only minimally.  R. 664.  He also took pain medication, but asserted that this did not work "half the time."  R. 665.  Plaintiff said that when he sat down to read the newspaper in the morning, he could not get through more than a few pages because he would lose focus and experience "a bad burn in my back and in my shoulders."  R. 669.  Plaintiff said that he had pain in his lower skull, shoulder blade, and right arm every day.  R. 671-672.  He said that he had daily difficulties with concentration.  R. 671.

Plaintiff said he had seen three psychiatrists for about a year and a half.  R. 667.  He was taking Klonopin[2] for anxiety.  R. 669.  He said he had not seen a psychiatrist

---

[2] Klonopin is used alone or along with other medications to treat convulsive disorders such as epilepsy.  It is also prescribed for panic disorder, that is, unexpected attacks of overwhelming panic accompanied by fear of recurrence.  Klonopin belongs to a class of drugs known as benzodiazepines.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

since the preceding September because he had no insurance.  *Id.*  He said that almost once a day he had to lie down for five minutes to one hour to stay calm.  R. 670.

The second hearing took place on July 7, 2005.  R. 619.  Plaintiff said he was then taking OxyContin,[3] Percocet,[4] Remeron,[5] and Klonopin for pain, anxiety, and depression.  R. 631.  Plaintiff testified that he has a driver's license with no limitations, but that someone gave him a ride to the hearing.  R. 621.  Plaintiff testified that he was seen at the Shands Psychiatry Clinic for depression and adjustment disorder.  R. 624.  Plaintiff said that he experiences sudden outbursts of anger, sometimes a couple of times a day.  R. 625.  He also becomes panicky and cannot function.  *Id.*  Plaintiff said he has mood swings.  R. 626.  He said that he has difficulty concentrating upon a task, and becomes irritated.  R. 627.  Plaintiff said he no longer has stamina to complete a project.  R. 630.  Plaintiff said he feels he needs mental health treatment, but does not have money to pay for it.  R. 631.

---

[3] OxyContin is an opioid analgesic consisting of oxycodone hydrochloride; it has an abuse liability similar to morphine and is a schedule II controlled substance.  It is used to manage moderate to severe pain when a continuous, around-the-clock analgesic is needed for an extended period of time.  PHYSICIANS' DESK REFERENCE (2005).

[4] Percocet, a narcotic analgesic, is used to treat moderate to moderately severe pain. It contains two drugs – acetaminophen and oxycodone. Acetaminophen is used to reduce both pain and fever.  Oxycodone, a narcotic analgesic, is used for its calming effect and for pain.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[5] Remeron is prescribed for the treatment of major depression – that is, a continuous depressed mood that interferes with everyday life. Remeron is thought to work by adjusting the balance of the brain's natural chemical messengers, especially norepinephrine and serotonin. It belongs to the class of drugs known as tetracyclics and is chemically unrelated to other antidepressants such as serotonin reuptake inhibitors and MAO inhibitors.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

Plaintiff said that his daily activities vary.  R. 631.  He said:  "Some days I'll do some dishes, do some dusting, mess with the animals a little bit."  *Id.*  He spends 15 to 20 minutes with the animals, and ten minutes doing dishes.  R. 632.

The vocational expert at the second hearing was asked to assume a hypothetical person of Plaintiff's age, education, and past relevant work.  R. 636.  He was asked to assume that the person was able to perform light work with the restrictions of being able to only occasionally kneel, stoop, crouch, and crawl, use hands overhead, and unable to climb ladders, ropes, or scaffolds.  *Id.*  The expert said that such a person could still do Plaintiff's past relevant work as a retail store manager or a food service manager.  *Id.* The ALJ then added the restriction of "some mild attention problems, gets irritable and angry, [but] should be able to perform a low stress job."  R. 637.  The expert said that such a person could not do unskilled work at all because "you can't just periodically have fits of irritation and anger that would interfere with the operation of the jobs you're doing or other people's jobs."  R. 637-638, 642.

The ALJ then asked the vocational expert to assume that the person has the restrictions set forth in exhibits 20F (R. 425-437) and 26F (R. 596-601, the consultative evaluation of Dr. Beaty, described ahead), which included:  mild limitations of memory and understanding: marked restrictions in maintenance of attention and concentration for extended periods; extreme limitations in the ability to perform activities within a schedule, maintain regular attendance, and be punctual; and extreme limitations in ability to work a normal work week without interruption from psychologically based symptoms, to maintain proper neatness, to maintain proper social behavior, and to respond in a work setting.  R. 639.  The vocational expert said that there were no jobs in

the national economy that such a person could perform.  *Id.*  The ALJ included the

"marked" limitations due to pain, and the expert's response, that there was no work in

the national economy for such a person to perform, was the same.  R. 639-640.

**Medical Evidence**

On October 3, 1999, Plaintiff had an MRI of his cervical spine.  R. 139.  This

revealed a "focally protruded disc to the right of C5-6 with potential right C6 nerve

compression."  *Id.*  "[M]ild right cord deformity" was noted.  *Id.*  There is a note dated

October 6, 1999, that Plaintiff had not attended physical therapy since September 21,

1999, and was discharged.  R. 162.  On November 8, 1999, Plaintiff underwent an

anterior cervical diskectomy.  R. 140.  A metal plate was affixed at that level of the

cervical spine.  R. 141.  The diagnosis before the operation was "intractable right

cervical brachial pain and radiculopathy secondary to [a] work-related cervical disk

herniation at C5-6."  R. 140.

On January 21, 2000, shortly after the operation, Plaintiff was again in physical

therapy.  R. 154.  He had been to therapy five times in that month, starting on January

5, 2000.  R. 145.  It was recommended that he attend six more treatment sessions.  *Id.*

On February 21, 2000, it was noted that while he performed well at the clinic in January,

2000, "follow through at home was sporadic."  R. 146.  He had not attended the six

additional treatment sessions.  *Id.* and R. 147-149.

On July 6, 2000, Plaintiff was evaluated by Bruce A. Mueller at "Rehab Solutions"

to determine his residual functional capacity.  R. 195-213.  Pain upon movement was

reported to Mr. Mueller at the level of 4 or 5 on a scale of 10.  R. 199-201.  The

movement tests results were considered to be valid.  R. 201.  Plaintiff exhibited

excellent effort on tests of strength, agility, and material handling, again with the same

levels of pain reported.  R. 202-207.  However, Plaintiff's overall strength profile was

poor.  R. 209.  It was determined that Plaintiff's movement patterns and behavior

correlated with the reported symptoms and disability, and that symptom and disability

exaggeration was not present.  R. 211.  Based upon all of the tests, Mr. Mueller

determined that Plaintiff was capable of doing light work for an 8 hour day and that the

results were valid based upon excellent effort.  R. 195, 213.

On February 12, 2001, Plaintiff was examined on a consultative basis by Robert

A. Greenberg, M.D.  R. 225-226.  Dr. Greenberg found that Plaintiff had:

> decreased ROM [range of motion] of the cervical spine.  There was full
> ROM of all the other joints.  Gait and station were normal.  Patient did not
> require any assisting device for ambulation.  No evidence of active
> inflammatory arthritis was present.  No motor[,] sensory or reflex
> abnormalities were noted.  Grip strength and fine manipulation were
> normal.  Repetitive muscle testing did not reproduce fatigue.

R. 226.  Dr. Greenberg said that "[b]ased on these findings, I felt that the patient should

be able to perform most work related activities that do not require heavy lifting."  *Id.*

On February 13, 2001, Plaintiff was seen by Andres Nazario, Ph.D., for a

consultative psychological evaluation.  R. 228-231.[6]  Plaintiff told Dr. Nazario that he

was able to do "light shopping," take care of his personal hygiene needs, "sometimes"

cook, clean house, wash dishes, and do laundry as long as he did not have to carry the

laundry.  R. 230.  Plaintiff said that he was not able to work in the yard, but was usually

able to care for his pets.  *Id.*  He said he does not sleep well at night, cries occasionally,

---

[6] The pages of this report were assigned Record page numbers out of order.  The
correct order for review is R. 228, 230, 231, and 229, respectively.

and often felt angry.  *Id.*  Dr. Nazario concluded that Plaintiff's "emotional difficulty does

not seem severe enough to preclude employment."  R. 231.  He thought that the

prognosis for recovery "is good if he follows through," and that Plaintiff's medical

problems should be assessed by medical doctors.  *Id.*

On April 30, 2001, Plaintiff was examined on a consultative basis by Amit

Vijapura, M.D., a board certified psychiatrist.  R. 260-261.  Dr. Vijapura wrote that after

his accident and surgery, Plaintiff went to vocational rehabilitation and had started going

to school to learn new work.  R. 261.  Plaintiff said that he experienced constant neck

pain, and tingling and numbness in his right shoulder.  *Id.*  His physician "abruptly"

stopped his pain medication (Lortab[7]), and Plaintiff became "extremely agitated and

angry, and he threatened the physician."  *Id.*  He had then "gone through significant

fluctuation in his mood," becoming irritable and unable to concentrate.  *Id.*  He also had

feelings of worthlessness and hopelessness.  *Id.*  He related that Remeron had helped,

---

[7] Lortab is one of the brand names for hydrocodone.  PHYSICIANS' DESK REFERENCE (2004), p. 3233.  Hydrocodone is a semisynthetic narcotic derivative of codeine having sedative and analgesic effects more powerful than those of codeine.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

but he had been given Paxil[8] and Zoloft,[9] which were ineffective.  *Id.*  Dr. Vijapura's

diagnosis was "major depression, severe, secondary to his job injury," and chronic pain.

*Id.*  He recommended that Plaintiff:

> receive immediate psychiatric treatment.  His current psychiatric diagnosis
> is related to his injury.  He would benefit from medication treatment with
> Remeron as well as some ongoing psychotherapy.  The patient has not
> reached maximum medical improvement at this time.  The patient is
> unable to work in any job situation at this time due to his psychiatric
> symptoms.

R. 260.  On Axis V, Dr. Vijapura assigned a GAF score of 50.[10]

---

[8] Paxil relieves a variety of emotional problems. It can be prescribed for serious, continuing depression that interferes with ability to function. Paxil is also used to treat obsessive-compulsive disorder (OCD), panic disorder, generalized anxiety disorder, social anxiety disorder, and post-traumatic stress disorder.  Paxil belongs to the class of drugs known as selective serotonin reuptake inhibitors (SSRIs).  Serotonin is one of the chemical messengers believed to govern moods.  Ordinarily, it is quickly reabsorbed after its release at the junctures between nerves.  Reuptake inhibitors such as Paxil slow this process, thereby boosting the levels of serotonin available in the brain. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[9] Zoloft is prescribed for major depression – a persistently low mood that interferes with everyday living.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[10] "The GAF scale reports a 'clinician's assessment of the individual's overall level of functioning.'  *American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders* 30 (4th ed. 1994)."  Sims v. Barnhart, 309 F.3d 424, 427 n. 5 (7th Cir. 2002).

> GAF scores of 41 to 50 reflect "[s]erious symptoms (e.g., suicidal ideation,
> severe obsessional rituals, frequent shoplifting) OR any serious
> impairment in social, occupational, or school functioning (e.g., no friends,
> unable to keep a job)."  Manual at 34.  GAF scores of 51-60 indicate
> "[m]oderate symptoms (e.g., flat affect and circumstantial speech,
> occasional panic attacks) OR moderate difficulty in social, occupational, or
> school functioning (e.g., few friends, conflicts with peers or co-workers)."

Hudson ex rel. Jones v. Barnhart, 345 F.3d 661, 663 n. 2 (8th Cir. 2003).

On December 26, 2001, Plaintiff was evaluated at the Shands Psychiatry Clinic by Dr. Toby Goldsmith.  R. 401.  Plaintiff had been referred to the Clinic about a year earlier because he had threatened his neurologist, Dr. Scott, for refusing to increase his narcotic medication.  *Id.*  Dr. Goldsmith noted that Plaintiff had been treated for mood swings, depression, and anxiety.  *Id.*  He noted that Remeron had been effective.  *Id.* Plaintiff had to stop taking Remeron because his workers' compensation would not pay for it and he had switched to Zoloft, which was not as effective.  *Id.*  Plaintiff reported that he experienced sudden irrational outbursts, anger, and verbal abusiveness toward others.  *Id.*  He reported weight loss, anxiety, and feelings of worthlessness.  *Id.*  Plaintiff was then taking OxyContin and hydrocodone for breakthrough pain.  *Id.*  Plaintiff said that the pain was "well controlled."  *Id.*  It was noted that Plaintiff had a history of noncompliance with his medications.  *Id.*  It was reported that Plaintiff used marijuana approximately once a week, had no history of alcohol dependence or abuse, and had smoked one and one-half packs of cigarettes daily for the prior 15 years.  R. 402.  Dr. Goldsmith found Plaintiff's insight and judgment to be "fair to poor."  *Id.*  His diagnosis on Axis I was "major depression" and "impulse control disorder NOS, evaluate for intermittent explosive disorder."  *Id.*  On Axis V, Dr. Goldsmith assigned a GAF score of 45-50.

On May 11, 2002, Plaintiff had an MRI of his cervical spine.  R. 363.  The impression was "[s]tatus post anterior cervical fusion C5/C6.  No neural foraminal narrowing.  Very small central disc protrusion C4/C5.  Minimal ventral thecal sac impression."  *Id.*

On August 9, 2003, Plaintiff went to the emergency room and was seen by Noel

R. Braseth, M.D.  R. 479.  He reported that he had increasing neck pain because he

was out of medications.  *Id.*  Dr. Braseth noted that his medical history was "significant

for multiple herniations of [the] cervical spine discs secondary to a slip and fall at work

several years ago.  He has had fusion surgeries."  *Id.*  Plaintiff denied paresthesias or

weakness.  *Id.*  Upon examination, Dr. Braseth found that Plaintiff maintained good

forward flexion, good hyperextension, and his stability was intact.  R. 480.  He

prescribed Relafen and 20 Percocet with "zero refills."  *Id.*  Plaintiff was to see Dr.

Depaz for followup.  *Id.*

Plaintiff returned to the emergency room on September 10, 2003, for pain

medication and was seen by John G. Shedd, M.D.  R. 467.  It was noted that he was

seen a month earlier, was to have followed up with Dr. Depaz or a primary care

physician, and was totally out of medications.  *Id.*  Dr. Shedd also noted:

> He states that he is out of the Percocet.  At the time he was told that we
> will not be continuing to fill his prescriptions for narcotic medications and
> he needed to establish with a primary care or pain management physician.

*Id.*  Plaintiff did not see Dr. Depaz in the interim.  *Id.*  Plaintiff was discharged with a

prescription for several drugs, including Ultram.[11]  R. 468.  Dr. Shedd wrote:

> The patient was to be discharged, however, he then confronted the nurse
> and then also I spoke with him.  He stated that Ultram [did] not help him.  I
> told him that we would not be giving him any narcotic medications.  He
> then became belligerent and angry and verbally abusive.  I reiterated the
> fact that he needed to followup with a primary care physician, that we did
> not refuse giving him pain medications, however, we did not feel it was in
> his best interest to prescribe narcotics and he can followup with his other

---

[11] Ultram (tramadol hydrochloride tablets) is a centrally acting synthetic opioid
analgesic.  PHYSICIANS' DESK REFERENCE (2005).

physicians for further medications.  He took the prescriptions in his hand,
crumpled them up and walked out of the emergency room.

*Id.*

Plaintiff returned to the emergency room on January 29, 2004, following a motor

vehicle accident.  R. 452.[12]  Plaintiff's only complaint was neck pain.  *Id.*  There is no

description of new injury to Plaintiff flowing from this accident.  Upon examination, it was

found that:

> [Plaintiff] had full range of motion on flexion and extension lateral and
> bending and rotation to what he says is his maximum end point which was
> 60 degrees.  He had minimal pain with palpation of the paravertebral
> muscles and the rhomboid and trapezius muscles bilaterally.

R. 453.  X-rays of the cervical and lumbar regions were negative for dislocation or

fracture, and the plate in Plaintiff's neck was in good alignment with screws all in place.

*Id.*  The treating physician, Stephanie B. Lord, M.D., prescribed Flexeril, Vioxx, and 12

Lortab tablets.  R. 453 and 451.

On February 23, 2004, Plaintiff was seen by Oscar B. Depaz, M.D., for an initial

office visit.  R. 526-528.  Tenderness was noted on palpation in the bilateral occipital

region, upper trapezius area, and bilateral rhomboid regions.  R. 527.  Range of motion

of the cervical spine was only mildly limited when done "in a very tentative and slow

manner."  *Id.*  Other special maneuvers, including seated SLR (straight leg raising),

were negative.  R. 528.  Weakness was noted on internal rotation of the right shoulder.

---

[12] The record page numbers are out of order.  There are two pages bearing R. 451
as the record page number.  The second R. 451 is page number 3 of this report.  R. 452
is page number 1 of this report.  R. 453 is page number 2 of this report.  I have left the
pages of the record in the order in which I found them.

*Id.* Other strength was intact and Plaintiff's gait was normal.  *Id.*  Dr. Depaz referred Plaintiff to physical therapy, and ordered a CT scan and electrodiagnostic studies.  *Id.*

On March 15, 2004, Plaintiff had a return visit to Dr. Depaz.  R. 524.  An EMG test[13] was conducted.  *Id.*  Dr. Depaz found: "Normal EMG right upper extremity and associated paraspinal muscles."  *Id.*

On March 16, 2004, Plaintiff had a CT scan of his cervical spine.  R. 530.  The impression was:  "Status post ACDF C5/6 with instrumentation.  Minimal degenerative cervical spondylosis above the fusion at C5/5.  No evidence for bony central canal stenosis or foraminal stenosis at any level."  *Id.*

Plaintiff was seen again by Dr. Depaz on March 19, 2004.  R. 522.  The results of the CT scan described immediately above were noted.  *Id.*  Plaintiff told Dr. Depaz that Percocet 7.5 mg was not helping.  *Id.*  Plaintiff complained of left hip pain, and x-rays were scheduled.  R. 522-523.

On April 1, 2004, Dr. Depaz received a letter from Physical Therapist Ludo Wolf. R. 521.  Mr. Wolf stated that Plaintiff was seen for an initial evaluation on February 27, 2004, but then did not appear for appointments scheduled on March 2, 2004, and March 5, 2004.  *Id.*  Plaintiff said that he was dealing with his insurance company, did not want to pay for physical therapy, and was "having his lawyer try to sort out the problems."  *Id.* Mr. Wolf discharged Plaintiff from physical therapy.  *Id.*

---

[13] Electromyography, that is, an electrodiagnostic technique for recording the extracellular activity of skeletal muscles at rest, during voluntary contractions, and during electrical stimulation.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

On April 2, 2004, Plaintiff returned to Dr. Depaz, continuing to complain of left hip pain.  R. 519.  He said he could not afford physical therapy.  *Id.*  On April 30, 2004, Plaintiff told Dr. Depaz he was steadily getting worse.  R. 517.  He denied any "untoward side effects" from his medication.  *Id.*

On June 7, 2004, Dr. Depaz noted that Plaintiff had not attended his May 21, 2004, appointment and was "in the Carolina's [sic] at a conference with his girlfriend."  R. 514.  Plaintiff said that his current medications were "helping only somewhat."  *Id.*  He again denied that the medications caused any adverse side effects.  *Id.*  Dr. Depaz provided a prescription for OxyContin and referred Plaintiff to Dr. Eric Scott "due to non-resolution of his pain."  R. 515.

Plaintiff continued to see Dr. Depaz, returning on June 29, 2004.  R. 511.  He said he had not started physical therapy because he had a rash from poison ivy.  *Id.*  Plaintiff said the OxyContin he was taking was "not quite strong enough."  *Id.*  A narcotic pain agreement was signed that day.  R. 512.  Plaintiff said he had become "quite anxious and depressed regarding his post injury status."  *Id.*

Plaintiff was seen again on July 23, 2004.  R. 509.  Another physician had recommended physical therapy.  R. 510.  Plaintiff did not want surgery.  R. 509.  Plaintiff returned on September 14, 2004, having missed his last appointment.  R. 507.  Dr. Depaz said that Plaintiff "had difficulty concentrating on the questions posed to him during the visit today.  Many times, they had to be repeated 2-3 times before he would respond.  He kept his head in his hands and seemed very drowsy and non-focused."  *Id.*

On November 2, 2004, Dr. Depaz prepared a "Permanent Impairment Report, Return Office Visit."  R. 505-506.  This impairment rating was limited to the effects of the

motor vehicle accident Plaintiff was in on January 28, 2004, and excluded pre-existing conditions.  R. 506.  Dr. Depaz reported that Plaintiff had left his medications in his brother's shaving kit in Miami.  R. 505.  Dr. Depaz noted that Plaintiff was noncompliant with physical therapy, "noting various reasons, including insurance difficulties, prescriptions, developing a poison ivy rash and being in the Carolinas at a conference." *Id*.  Upon examination, Dr. Depaz found "tenderness in the cervical paramusculature and upper trapezius area and decreased internal rotation of the right shoulder with associated weakness."  *Id*.  Dr. Depaz was concerned that Plaintiff had been "non-compliant with keeping followup visits for narcotic refills, and has [cited] running out of his medications and leaving them behind when [traveling], which indicates irresponsibility on the patient's part and accountability of controlled substances."  R. 506.  A drug urine screen was scheduled.  *Id*.

On January 5, 2005, Plaintiff was seen at the Alachua General Hospital Urgent Care Center.  R. 533.  His pit bull had been running around and jerked him, twisting his lower back.  *Id*.  A history of chronic narcotic use was noted.  *Id*.  Plaintiff asked for oxycodone, but tramadol (Ultram) was prescribed.  *Id*.

On March 15, 2005, David Kemp, M.D., prepared a "Clinical Assessment of Pain by Treating Physician," a checklist form.  R. 590-595.  Dr. Kemp said he had evaluated Plaintiff only once, and that Plaintiff had seen Dr. Kemp's partner twice.  R. 595.  He noted that Plaintiff had had extensive "workups" and evaluations by Dr. Depaz and Dr. Kemp had those records.  *Id*.  Dr. Kemp said that, objectively, a person with Plaintiff's diagnosis would be expected to experience pain.  R. 590.   He thought that Plaintiff had chronic pain syndrome and his pain was continuous.  R. 591.  He noted that Plaintiff

received opioid medications for pain. R. 592. He expected that Plaintiff would suffer somnolence from these medications. *Id.* He thought that Plaintiff did not suffer anxiety or depression from the pain. *Id.* Dr. Kemp said that Plaintiff reported a "marked" level of pain, 6 or 7 on a scale of 10, "that interferes with concentration, persistence and pace and prevents the patient from completing tasks relating to the activities of daily living without frequent (hourly) interruptions for pain relief and . . . would prevent the patient from completing tasks at work without frequent (hourly) breaks or interruptions for pain relief." R. 593. Dr. Kemp stated that in his "medical assessment of both the patient's subjective reporting and objective findings," Plaintiff suffered both moderate and marked levels of pain, with the marked level causing the same functional impairments. R. 593. Finally, Dr. Kemp rated Plaintiff's level of restriction as only "mild' with respect to concentration, maintaining a schedule, and appropriate interaction with others, essentially causing no impairment at all. R. 594. He thought, however, that Plaintiff was "markedly" limited with respect to his ability to complete a normal workday or workweek without interruptions from pain, or to perform at a consistent pace without an unreasonable number and length of rest periods. *Id.* The term "marked" had the same meaning as set forth above.

On July 3, 2005, William E. Beaty, Ph.D., prepared an a mental health evaluation after examination of Plaintiff on a consulting basis. R. 596-601. He found Plaintiff to be lethargic but cooperative and interactive, with good eye contact. R. 596. Plaintiff was then staying at home. R. 597. He had previously been diagnosed with adjustment reaction with depressed mood. *Id.* He spent his days "veging out." R. 598. Plaintiff told Dr. Beaty that he was able to perform:

> some light house cleaning with rests, including washing dishes,
> vacuuming, neatening [sic] up, but not every day, very inconsistently.  He
> used to do some light yard work . . . but had to quit even that because he
> would "pay for it" for several days later.  He does little cooking.
> Sometime[]s he feels a little "stir crazy" so he just drives around for hours.
> He cares for his own hygiene, but said that some days he does not
> shower or even get out of his pajamas.

R. 598.  Dr. Beaty's diagnosis was mood disorder due to pain secondary to neck injury

and fusion of the cervical spine, with major depressive-like features.  *Id.*  He assigned a

GAF score of 55.  *Id.*  Dr. Beaty provided the following comments about Plaintiff's ability

to do work-related tasks:

> Limited sitting, standing, walking, lifting, carrying, handling objects.  "No
> bending, kneeling, overhead movement, no repetitive motions, no
> prolonged movements, no tilting his head either backward or down to his
> chest."  He can speak, hear, and travel adequately.  Understanding and
> memory appear basically intact, sustained concentration and task
> persistence compromised.  Social skills are adequate but his mood and
> pain make social interaction very strenuous over a period of time, and his
> level of social adaptability is curtailed.

*Id.*  Dr. Beaty also filled out a mental residual functional capacity assessment by

consulting physician.  He found Plaintiff to be only mildly or moderately limited in a

number of areas important to the ability to do work.  R. 599-601.  However, he found

Plaintiff to be markedly limited (seriously limited) in ability to maintain attention and

concentration for extended periods, to get along with others without distracting them or

exhibiting behavioral extremes, to maintain socially appropriate behavior, and to

respond properly to changes in the work setting.  R. 600-601.  He found Plaintiff to have

extreme limitations ("no useful ability to function in this area")  in his ability to perform

activities within a schedule and to be punctual, or to complete a normal workday without

interruption or an unreasonable number and length of rests periods.  R. 600.

**Legal Analysis**

   **The credibility of Plaintiff's pain testimony**

   Plaintiff contends that the Administrative Law Judge erred in her evaluation of the

credibility of his pain testimony.  Pain and other symptoms reasonably attributed to a

medically determinable impairment are relevant evidence for determining residual

functional capacity.  Social Security Ruling 96-8p, p. 4.  Pain and other symptoms may

affect either exertional or non-exertional capacity, or both.  *Id.*, p. 6.

> In order to establish a disability based on testimony of pain and other
> symptoms, the claimant must satisfy two parts of a three-part test
> showing:  (1) evidence of an underlying medical condition; and (2) either
> (a) objective medical evidence confirming the severity of the alleged pain;
> or (b) that the objectively determined medical condition can reasonably be
> expected to give rise to the claimed pain.  *See Holt v. Sullivan*, 921 F.2d
> 1221, 1223 (11th Cir. 1991).  If the ALJ discredits subjective testimony, he
> must articulate explicit and adequate reasons for doing so.  *See Hale v.
> Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).  Failure to articulate the
> reasons for discrediting subjective testimony requires, as a matter of law,
> that the testimony be accepted as true.  *See Cannon v. Bowen*, 858 F.2d
> 1541, 1545 (11th Cir. 1988).

Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002).  The reasons articulated for

disregarding the claimant's subjective pain testimony must be based upon substantial

evidence.  Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532

(11th Cir. 1991).  It is not necessary that the ALJ expressly identify this circuit's pain

standard if his findings "leave no doubt as to the appropriate result" under the law.

Landry v. Heckler, 782 F.2d 1551, 1553-1554 (11th Cir. 1986).

   "A claimant's subjective testimony supported by medical evidence that satisfies

the pain standards is itself sufficient to support a finding of disability.  Indeed, in certain

situations, pain alone can be disabling, even when its existence is unsupported by

objective evidence."  Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995) (citations

omitted).  "[W]here proof of a disability is based upon subjective evidence and a

credibility determination is, therefore, a critical factor in the Secretary's decision, the ALJ

must either explicitly discredit such testimony or the implication must be so clear as to

amount to a specific credibility finding."  Id. at 1562, quoting, Tieniber v. Heckler, 720

F.2d 1251, 1255 (11th Cir. 1983).

    Defendant points out that the ALJ's credibility finding is based upon the following

evidence in the record:  no marked limitation of motion; no muscle atrophy; only slight

decrease in muscle strength; no muscle fatigue; normal gait; normal grip strength and

fine manipulation; denial of weakness or paresthesias; cervical x-rays revealed only a

small central disc protrusion and disc bulge at C6-7, without herniation or stenosis;

Plaintiff was neurologically intact; Plaintiff was noncompliant with physical therapy; and

failing to stop smoking tobacco.  Doc. 16, p. 6.  Defendant also points out that the ALJ

relied upon the following in the record:  that Plaintiff's pain was controlled with

medication and he responded well to physical therapy; Plaintiff repeatedly demanded

narcotic pain medication and became angry when denied; and Plaintiff was not

accountable for the narcotic pain medication he received.  Id., p. 7.  Defendant also

notes that Plaintiff had adequate memory and attention; could perform household

chores, such as dusting, taking care of animals, and doing dishes; and did "ok" in

school.  Id., p. 8.  These indeed were the reasons given by the Administrative Law

Judge to discount Plaintiff's pain testimony.  R. 24.  All of this is supported by

substantial evidence in the record, discussed above, and constitutes substantial

evidence to discount Plaintiff's testimony.

Plaintiff relies upon the finding that there was no evidence that he exaggerated his description of pain.  Doc. 11, p. 7, citing R. 211.  That finding is found in Mr. Mueller's assessment of Plaintiff's residual functional capacity on July 6, 2000.  Mr. Mueller determined, however, that Plaintiff was capable of doing light work for an 8 hour day and that the results were valid based upon excellent effort.  R. 195, 213.

Plaintiff relies upon the MRI findings of cervical disk disease.  Doc. 11, p. 12. This MRI, however, was taken before Plaintiff underwent surgery.  The imaging results after the surgery do not reveal significant disk problems.

Plaintiff relies upon the fact that he has taken narcotic medications for years. Doc. 11, p. 12.  While this certainly is evidence that Plaintiff suffers pain, there is also evidence that Plaintiff's demand for pain medications may not be entirely related to the level of pain that he experiences, as the ALJ appears to have reasoned.

Plaintiff also relies upon the finding of Plaintiff's physician, Dr. Kemp.  Doc. 11, p. 7, citing R. 590-595.  Dr. Kemp rated Plaintiff's level of restriction as only "mild" with respect to concentration, maintaining a schedule, and appropriate interaction with others, essentially causing no impairment at all.  R. 594.  He thought, however, that Plaintiff was "markedly" limited with respect to his ability to complete a normal workday or workweek without interruptions from pain, or to perform at a consistent pace without an unreasonable number and length of rest periods.  *Id.*

The opinion of a claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  This is so because treating physicians:

are likely to be the medical professionals most able to provide *a detailed, longitudinal picture* of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(d)(2) (emphasis added).  Important to the determination of whether there is a "detailed, longitudinal picture" of impairments is the length of the treatment relationship, the frequency of examination, the extent of knowledge of the treating source as shown by the extent of examinations and testing, the evidence and explanation presented by the treating source to support his or her opinion, the consistency of the opinion with the record as a whole, and whether the treating source is a specialist with respect to the particular medical issues.  20 C.F.R. § 404.1527(d)(2)-(5).

Dr. Kemp said he had evaluated Plaintiff only once, and that Plaintiff had seen his partner twice.  R. 595.  He also relied upon records from physicians other than his partner.  Therefore, in effect Dr. Kemp expressed an opinion more as a consulting physician than as a treating physician, and it was not error to fail to give Dr. Kemp's opinion substantial weight.  While the ALJ could have relied more heavily upon this consulting opinion, this court's role is not to determine whether there is substantial evidence to support a contrary conclusion, but to determine whether the ALJ's determination is supported by substantial evidence.  As noted earlier, "[i]f the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted).  A consultative examination, that is, a one-time

examination by a physician who is not a treating physician, need not be given deference by the Commissioner.  McSwain v. Bowen, 814 F.2d 617, 619 (11th Cir. 1987).

For these reasons, the ALJ properly followed this circuit's pain standard.  The reasons given for not giving full credit to Plaintiff's pain testimony are supported by substantial evidence in the record and must be affirmed.

> **Whether the hypothetical questions posed to the vocational expert are supported by substantial evidence.**

Plaintiff argues that the ALJ failed to include all of his severe impairments in the hypothetical put to the vocational expert.  Doc. 11, p. 14.  Plaintiff contends that the hypothetical should have included limitations caused by his chronic pain and depression.  *Id.*  In particular, Plaintiff argues that the ALJ should have included the limitations set forth in his representative's question to the vocational expert.  *Id.*, p. 15. This assumed a "person who due to lack of concentration and focus or breathing problems and anxiety, would withdraw from the work station two to three times a day for five minutes to an hour . . . ."  *Id.*, citing R. 678.  The vocational expert said that such a person would be unable to do any kind of work.  R. 678.

The passage cited is from the first administrative hearing.  The ALJ did not rely on this vocational expert evidence from the first hearing.  Instead, another vocational expert was called at the second hearing and the ALJ asked that expert a series of questions.  R. 636-642.  The second ALJ relied upon this testimony.  R. 26.  Plaintiff has not addressed his arguments to the vocational hypothetical relied upon from the second hearing.  Consequently, this argument is unrelated to the determination of the ALJ at issue here.

**Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge correctly followed the law and are based upon substantial evidence in the record.  The decision of the Commissioner should be affirmed.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **AFFIRMED**.

**IN CHAMBERS** at Tallahassee, Florida, on September 12, 2008.


s/     William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**